**HOLLAND v. GROSS et al.**

No. 5886.

Court of Appeal of Louisiana. Second Circuit.

April 28, 1939.

On the Merits Jan. 5, 1940.

Application for Review Withdrawn March 18, 1940.

Edward L. Gladney, Jr., of Bastrop, and Hudson, Potts, Bernstein & Snellings of Monroe, for appellant.

Robert P. Kennedy, of Lake Providence, and Theus, Grisham, Davis & Leigh, of Monroe, for appellees.

DREW, Judge.

This case involves the same issues as No. 5882, 195 So. 837; however, the amount claimed is less than $2000, and there was never any question as to our jurisdiction of this case. We thought, however, it best, if the other case was transferred to the Supreme Court, to await the decision of that court before passing on the issues in this case. It was therefore not argued when called.

Since we find we have jurisdiction in No. 5882, it becomes necessary to return this case to our docket to be refixed for argument.

On the Merits.

TALIAFERRO, Judge.

At about 8:30 o'clock P. M., July 11, 1937, the light weight pick-up truck of W. O. Holland, occupied by himself as driver, his wife and four minor children, was violently run into from the rear by an automobile driven by Justin Gross, unemancipated minor son of defendant, Joseph C. Gross, on the highway between Oak Grove and Lake Providence, Louisiana. All occupants of the Holland truck were injured. Mrs. Holland died on September 26, 1937 from her injuries. W. D. Holland, a son aged seventeen, died August 6, 1937 of pneumonia superinduced by the injuries received in the accident.

W. O. Holland qualified as natural tutor to his three daughters, Margie, Mary and Margaret, aged respectively thirteen, eleven and nine years. He instituted separate suits on behalf of said minors against Joseph C. Gross to recover damages for the injuries they sustained as the result of the collision. The present suit is on behalf of Margaret, for the sum of $750. This suit and suits Nos. 5882, 195 So. 837, 5883, 195 So. 840,

5884, 195 So. 842, 5885, 195 So. 839, and 5887, 195 So. 843, on the docket of this court, growing out of the same accident, this day decided, were consolidated below and here for trial.

Plaintiff alleges that he was driving his truck on his side of the hard surfaced road at a speed of between 20 and 30 miles per hour, with head and rear lights burning, when the Gross car, running at a speed in excess of 50 miles per hour, without signal or warning, ran into the rear end of the truck, knocking it more than 50 feet down the road and catapulting therefrom to the highway, the son and two elder daughters then seated in the vehicle's body.

The collision, it is charged, was attributable solely to the carelessness and negligence of the defendant's son, in these particulars, to-wit:

That he was driving at an excessive and unlawful rate of speed and had not his car under proper control; that he was under the influence of intoxicating liquor and was an incompetent operator of a motor vehicle in that his vision was defective.

Plaintiff coupled with this suit for damages, a revocatory action wherein he seeks to have annulled and set aside a dation en paiement from Joseph C. Gross unto Gillis M. Franklin, of one lot with improvements thereon, in the town of Lake Providence, Louisiana, as being fraudulent and executed for the purpose of giving to said Franklin an unfair preference over plaintiff and other creditors of said Gross. It is averred that Gross, at the time of said transaction, was insolvent to the knowledge of Franklin; that the consideration expressed in the instrument of transfer did not exist; that unless said dation en paiement is annulled and set aside and the property therein described made subject to the payment of the claim for damage herein asserted, no collection thereof will nor can be made because said Gross is without other property of value.

Gillis M. Franklin was made a party to the suit. He excepted to the petition as disclosing neither a cause nor a right of action as to him. The exception was overruled.

As regards the demand for damages, defendant Gross denies each material averment of the petition. He also denies that the dation en paiement from him to Franklin is fraudulent or was executed to give him an unfair preference over other creditors, but, on the contrary, was consummated in good faith for the consideration therein expressed.

The answer of Franklin is practically the same in substance as that of Gross, and he additionally avers that said dation en paiement was executed to pay a debt of long standing due by Gross to him; that if Gross, at the time, was insolvent, which is denied, he, Franklin, was without knowledge thereof; that if Gross intended by the dation en paiement to defraud his creditors or to give him, Franklin, an unfair preference over them, he, Franklin, was ignorant of such intentions.

In the alternative, Franklin pleads that if said dation en paiement is annulled and set aside, the property affected thereby should be returned to Joseph C. Gross, subject to his, Franklin's, vendor's lien and privilege and special mortgage thereon, evidenced by notarial act executed May 10, 1921, recorded May 11, 1921, in the records of East Carroll Parish and reinscribed therein on February 15, 1938; that said lien, privilege and mortgage should be recognized and maintained against said property and be enforced thereon by preference.

There was judgment for plaintiff for $350, with legal interest from judicial demand. The demands in the revocatory action were rejected. Plaintiff, only, perfected appeal to this court.

Both defendants answered the appeal. Each prays that the court's ruling on the exception of no cause and no right of action be reversed and that the exception be sustained; that the dismissal of the revocatory action be affirmed and the judgment against Gross for damages be reversed.

■ The facts and attendant circumstances of the accident are, in the main, not seriously controverted. It is not seriously contended here that Justin C. Gross was not grossly negligent and careless in running into the Holland truck as it was proceeding along its proper side of the highway at a lawful rate of speed. Young Gross admits he was driving at the rate of 50 miles per hour when the collision occurred. We are convinced that this estimate of his speed is ultra conservative.

The truck was knocked more than 50 feet down the highway; its metal body was lifted to an angle of approximately twenty degrees and was driven forcefully against the back of the cab; the contour of the grill pro-

tecting the radiator of the Gross car was, by the force of the impact, impressed into the body of the truck. All of the pertinent physical evidence reflects beyond question the excessive speed of the automobile at the time of the impact.

Young Gross attempts to excuse himself for running into the truck on the ground that he was blinded by the glaring headlights of an approaching car at the time of or an instant before the collision; and, in addition, advances the theory that the truck must have been pulled to the shoulder and brought to a stop, as the other car approached it, and was in the act of resuming its side of the highway when rammed. This conjecture is indulged in to justify the admission of young Gross that he did not see the Holland truck until within 25 feet of it. He also contends that the truck's tail light was not then burning or else he would have seen it in time to have averted the collision. None of these facts, if they existed, are mentioned or set up in pleadings as a defense to the tort action. Contributory negligence is not pleaded. However, it is argued by defendants that inasmuch as testimony bearing upon these asserted facts was introduced without objection, especially as to the absence of the tail light, that the pleadings were thereby enlarged and contributory negligence of Holland may now be considered by the court as though such a plea had been formally tendered.

We are certain the Holland truck did not stop immediately prior to being run into and we are also certain that the car, whose lights young Gross says blinded him, passed his car when it was from 200 feet to 200 yards distant from the truck.

The Highway Regulatory Act (No. 21 of 1932, subsection (g) 4 of Section 9), in force when this accident occurred, requires that every motor vehicle operated on the highways of the state shall be equipped with a rear lamp with red light of sufficient candlepower that, under normal atmospheric conditions at night, it may be plainly visible for a distance of 500 feet.

■ It is contended that Holland's truck was not equipped with the rear light required by this law. If this were true, the omission would constitute negligence on his part, because the violation of or the failure to observe a traffic law amounts to negligence per se, but such negligence is not actionable unless it be the or a proximate cause of the accident, the happening of which is accredited thereto.

■ We think defendants' position correct as regards the effect to be given the testimony introduced without objection tending to prove that the truck's rear light was not burning when the accident occurred. Such testimony, when once admitted without objection, becomes competent evidence in the case and if it should preponderate in favor of defendants' contention, its ultimate effect would be to establish that Holland's negligence contributed to the accident and its results. Whether such negligence would be a proximate cause of the accident, in view of other proven facts, is not necessary to be presently determined.

■ Defendants' position carries with it the burden of proving their contention on the question of contributory negligence, in the same manner and to the same extent that would be true had a formal plea presenting that issue based upon the asserted facts, been tendered. Defendants have not proven to our satisfaction the truth of their position with respect to Holland's negligence. Testimony introduced on the question is irreconcilably in conflict. Holland is positive the tail light was burning when he left Oak Grove, not over thirty minutes before the accident occurred. His neighbors are positive the light was burning regularly as the truck was used on and about the farm. Some witnesses were sure the light had not been burning for some time, while one or two said it was not burning a short time prior to the collision.

Ordinarily, the presence or absence of a burning tail light on a motor vehicle at night does not impress the casual observer very much. It is somewhat surprising that so many persons are certain they did not see the tail light on the Holland truck burning the evening of the accident or during the few days prior thereto. The testimony on this question is quite indecisive.

The charge that young Gross was under the influence of strong drink when the collision occurred, is wholly without foundation. In a previous automobile accident he suffered the loss of vision of one eye, but it is not shown that this fact materially affects his ability to efficiently operate a motor vehicle at night. He says it does not. He was hastening to Lake Providence to fill a date with a girl friend and was evidently not keeping a vigilant lookout ahead as conditions and the speed he was going

demanded. There was no excuse for him not observing the Holland truck, with body and cab forming a large dark object on the road, in time to avert running into it.

The negligence of Justin Gross being the sole cause of the accident, and he being an unemancipated minor and living with his father at the time, the latter is legally responsible for the results of the accident. Civil Code, Art. 2318.

When the collision occurred, Mrs. Holland occupied a seat in the cab beside her husband. Her daughter, Margaret, was sitting in her lap. They were thrown violently against the dash of the truck, but luckily, the little girl sustained no really serious or permanent injuries. After rendition of first aid by a physician, she was allowed to return to her father's home. She was bruised on and about the body and suffered considerable shock and some pain. Naturally, it required several days for the soreness to entirely disappear. Appellees do not complain of the quantum. Appellant asks that it be increased. We think the lower court's award neither inadequate nor excessive. It is approved.

The exception of no cause and no right of action is founded upon the postulate that at the time the dation en paiement was signed, Gross did not owe plaintiff any debt, strictly and legally speaking, and, therefore, plaintiff was not then his creditor. This position propounds for determination for the first time in this state, the question whether a person suing in tort has the right to invoke the provisions of law (Arts. 1968 to 1994 of the Civil Code) to have annulled on the grounds of fraud against his rights or unfair preference to creditors, a sale of property by the tort feasor subsequent to the commission of the tort but prior to judicial demand. It has been held definitely in this state that such sales made subsequent to judicial demand are amenable to such an action.

Art. 1970 of the Civil Code gives to every creditor, when there is no cession of goods, an action to annul any contract by his debtor, made in fraud of his, the creditor's rights.

Art. 1971 of the Civil Code provides that this action may be exercised only when the debtor has not property sufficient to pay the debt of the complaining creditor, etc. Art. 1972 ordains that such action may not be exercised by individual creditors until their debts are liquidated by a judgment, unless the defendant in such action is made a party to the suit for liquidating the debt.

Art. 1975 confirms the right established by Art. 1972 to cumulate a revocatory action with the suit against the alleged debtor or to reduce to judgment an unliquidated claim, and gives to each defendant the right to controvert the demand of the plaintiff.

Art. 1993 of the Civil Code reads as follows: "No creditor can, by the action given by this section, sue individually to annul any contract made before the time his debt accrued.".

It is argued by exceptor that the potential debt which plaintiff sues to recover, to-wit, damages resulting from the tort, had not accrued when the attacked dation en paiement was executed on the 27th day after the date of the tort and on the 84th day prior to judicial demand.

The Supreme Court of this state, in a collateral manner, discussed this question in the following cases, to-wit: Goothye v. Delatour et al., 111 La. 766-771, 35 So. 896; Rownd et al. v. Davidson et al., 113 La. 1047, 37 So. 965; Ventrilla v. Tortorice et al., 160 La. 516-522, 523, 107 So. 390, 392.

Remarks on the subject made by the court in each case may properly be considered obiter. However, in the Ventrilla case, Justice St. Paul registered this very clear observation in passing, viz., "The question whether or not the provisions of R. C. C. art. 1970, giving every creditor an action to annul any contract made in fraud of his rights, applies to one whose claim arises ex delicito and is unliquidated, appears never to have been passed upon by this court; but the statute makes no distinction between creditors whose claims are liquidated and those whose claims are still unliquidated, and 'Ubi lex non distinguit, nec nos distinguere debemus.'"

Toward the close of the opinion, it is also said: "We are not to be understood, however, as holding that a party having an unliquidated claim for damages would have no right to annul a contract made to his prejudice between the happening of the tort and the date of judicial demand. As to that, we express no opinion whatever at this time, it being sufficient in this case to hold that he has such right as to contracts made after judicial

demand; and the other question will be met only when it comes up before us."

█ It will be observed from the summary of the Articles of the Civil Code, supra, that reference is often made to the plaintiff's monetary demand as an unliquidated debt or claim, which is sought to be reduced to judgment, the highest form of liquidated obligation. Yet, a judgment is not a debt in the strict sense of the term. It is but the recognition of the pre-existence of a debt or obligation. Goothye' v. Delatour, 111 La. page 770, 35 So. 896, supra; Succ'n. of Anderson, 33 La.Ann. 581.

In Dominique Lalane v. Jacob U. Payne et al., 42 La.Ann. 152–155, 7 So. 481, 482, the court declared: "We have frequently held that debts and obligations are not created by judgments of court, but only recognized by them, and rendered executory; that they confer no new rights, only confirm those already in · existence. Kinder v. Lyons, 38 La. Ann. 713; Thomas v. Guilbeau, 35 La.Ann. 927; Succession of Anderson, 33 La.Ann. 581."

In Morgan's Louisiana & T. R. & S. S. Co. v. Stewart, 119 La. 392–405, 44 So. 138, 142, the court considered the validity of a writ of attachment, issued at plaintiff's instance, wherein plaintiff sought to recover unliquidated damages resulting from criminal acts and offenses of several persons, especially of the defendant Stewart. The lower court dissolved the attachment on the ground that the debt sued for arose ex delicto and was unliquidated. This ruling was reversed by the Supreme Court, and in interpreting the word "debt" employed in Art. 242 of the Code of Practice, the existence of which is necessary to justify the attachment of property of the debtor in the hands of a third person, the court said: "It is true that article 242 of the Code of Practice on the subject of attachments uses the words 'debt,' 'debtor,' and 'creditor'; but we do not think that the ·term 'debt' should have placed upon it a meaning which would limit its scope to the 'obligation of a person to pay determinate sum of money due on an express agreement.' "

█ The only evidence before the court that Stewart was indebted to plaintiff was that reflected from the petition's allegations. It was undetermined and uncertain. A law suit only could fix the amount due, if any; yet the court held that there was sufficient definiteness of the alleged indebtedness to sustain the attachment, the harshest of procedure against a debtor. If sufficient for the purpose of attachment, surely it would be adequate for the purpose of a revocatory action coupled with suit to recover on the claim. The claim there, as in the present case, was a potential debt and plaintiff was a potential creditor. It seems to us that this is sufficient to meet the requirements of Art. 1993 of the Civil Code quoted above, and that the debt accrues for the purposes of this article, at the time injury is sustained or death occurs as a result of the tort.

█ "Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it." Civil Code, Art. 2315. This is the fundamental law of tort in this state. By "obliges" is meant legal duty and by "repair" is meant financial or other reparation through and by material substance.

█ The moment an actionable wrong is done to one person through the fault of another, there arises automatically an obligation on the part of the wrongdoer to repair the damage, the measure of which is confided to the judicial branch of the government for determination. In such a case, so far as the obligation to pay (repair) is concerned, it is as certain and definite as that arising in any other manner.

It is true, as argued by defendants, that the court in the Ventrilla case, supra, while discussing the question of interest on the debt sued for, one arising ex delicto, stated that the debt became due in legal contemplation on judicial demand; but in so saying, the court was controlled by the provisions of Act 206 of 1916, which arbitrarily declares that interest on judgments in this state, sounding in damages ex delicto, shall attach from judicial demand. Prior to the adoption of this act, by the jurisprudence, interest on such a judgment attached as of its date. It was necessary that there should be legislation on this subject, and, as between the two extremes, date of tort and date of judgment, the law maker chose the middle ground. It could just as well have said that such interest should attach from the date of the tort.

We are unable to perceive wherein this expression of the court is contrary to our interpretation of Art. 1993 of the

Civil Code with respect to the accrual of a debt for the purpose of the revocatory action.

A debt may have accrued and still not be exigible. A judicial demand, so far as we are able to perceive, adds nothing to nor does it detract from a demandable debt or obligation. Such a demand is simply the effort of the obligee to enforce judicially a right which the law has bestowed upon him; an effort to secure in a tort suit that sort of reparation which Art. 2315 of the Civil Code guarantees to him.

39 A.L.R. page 179, treating of this subject, states the rule prevailing in a majority of states, thus: "Persons having a right to sue for damages for tort are generally regarded as within the protection afforded by statutes relating to fraudulent conveyances, and entitled, when the claim has been reduced to a judgment, to maintain a suit to have such a conveyance set aside, where made after the cause of action arose."

The court in the Ventrilla case apparently did not insinuate that it would follow this rule in every respect. We do not understand from what the court there said that it was necessary that judgment be final in a tort suit before fraudulent transfers of the tort feasor could be attacked by the suing creditor. The inference is rather strong that such transfers could be attacked while suit was pending. If this were not permissible, in most cases, in fact in nearly all tort actions, the right to seek annulment of such transfers would be barred before final judgment could be secured. Such action on the part of the creditor is barred one year from the date of the fraudulent transfer. Art. 1987 of the Civil Code. And, of course, the danger of the creditor losing his right to have such transfers annulled would be greater as regards those which have been executed prior to judicial demand.

The general rule expressed in 39 A.L.R., supra, is to the effect that after judgment is rendered in a tort action the judgment creditor may, in his efforts to collect, recur to the status of things as of the date of the tort and come forward. The Supreme Court of this state has definitely said that fraudulent transfers subsequent to the filing of suit on a tort claim were amenable to attack by the tort claimant, but has left open for future determination whether such transfers, occurring between the date of tort and time of filing suit, are so amenable. We believe so, and, if so, we see no valid objection to cumulating the two demands. To permit this being done avoids another suit.

On May 10, 1921, Gillis M. Franklin sold and conveyed to Joseph C. Gross lots 1 and 2 of block No. 8 of the town of Lake Providence, Louisiana, with improvements thereon, for the price of $11,-000, whereof $1,000 was paid in cash; $6,500 by the assumption of an outstanding mortgage for that amount against the property and for the balance of $3,-500, the purchaser executed seven promissory notes of $500 each, payable annually with 8% interest, on the 1st day of January of the years 1922 to 1928, respectively. These notes were secured by a mortgage and vendor's lien on the property. The act of transfer and mortgage was recorded in conveyance and mortgage records the day after execution. Gross paid off the $6,500 mortgage and also paid three of the first maturing of said notes, leaving him due on the price, four of the notes. No part of these four notes, nor the accumulated interest thereon, was paid by him.

On August 7, 1937, the day following W. D. Holland's death, Gross transferred to Franklin Lot No. 1 of block No. 8 of said town, less a portion of it previously conveyed to R. P. Kennedy, for the stated price of $6,000, whereof $2,000 is declared to have been paid in cash on execution of the instrument, and as to the balance of $4,000, the parties declared:

"And in payment, discharge and satisfaction of the balance of said purchase price, namely the sum of Four Thousand an 00/100 ($4,000.00) Dollars, the said Gillis M. Franklin, vendee, declared that he does by these presents remit unto the said Joseph C. Gross, and release and absolve him, said Gross, from all further obligations or liability therefor, a certain debt for borrowed money which the said Gross owed him, said Franklin, amounting to the said sum of Four Thousand and 00/100 ($4,000.00) Dollars.

"And the said Joseph C. Gross declared that he does hereby accept of the said Franklin, the remission of said debt as said part of said price, and consideration of this sale and conveyance; and the said Gillis M. Franklin declared that he does

hereby accept the hereinabove described real property, with buildings and improvements thereon, for the consideration of said cash amount and of said remission of debt."

This is the instrument sought to be annulled and the property therein described sought to be subjected to the judgment against Gross in these consolidated suits. The said mortgage and vendor's lien was reinscribed on February 15, 1938, which was nearly seven years after the original inscription had perempted, and over three months subsequent to the institution of these suits.

No part of the consideration in this conveyance from Gross to Franklin was paid in cash.

In addition to said four $500 notes, with interest, according to Gross' testimony, he owed Franklin a considerable amount for cash money borrowed during the depression, the total aggregating $6,000 or more, including said notes, against all of which the statute of limitations had run. Gross testified that he agreed with Franklin to take $6,000 for the property which was intended to square all accounts between them. Gross' wife is Franklin's only child. The two families lived in the same house. Gross admits that he is not a very successful business man, while Franklin appears to have accumulated worldly goods of value. Gross found it necessary from time to time to ask financial aid of his father-in-law. When he failed to repay cash advances to him at maturity, no effort was made by Franklin to enforce payment. Due to their relationship, such obligations were allowed to "drift" until, as said before, the statute of limitations had run against all of them. Gross, of course, never denied his moral liability to Franklin on all financial obligations due to him, even after prescription had accrued, although he never formally acknowledged legal responsibility therefor after prescription attached. Therefore, we find, as did the lower court, that the indebtedness for which the dation en paiement was made, had, at the date thereof, long been extinguished by prescription and not renewed.

■ It is argued for defendants that Gross acknowledged legal liability on all of said indebtedness and renewed same by executing the dation en paiement, and that automatically the vendor's lien and mortgage originally securing the payment of the four $500 notes and interest, was revived, reinstated and restored to its former status as security. We are unable to concur in this position.

■ The vendor's lien and privilege, as is also true of a conventional mortgage, becomes extinct by the extinction of the debt which gives birth to them. Civil Code, Arts. 3277 and 3411. If the debt is evidenced by a note it is extinguished by the prescription of five years from maturity, unless the current of prescription is interrupted in some manner recognized by law. When such a note is extinguished by prescription, the lien and privilege and/or mortgage securing its payment, being an accessory obligation, also ceases to be effective as such. The life of the accessory obligation does not extend beyond the life of the primary obligation. Civil Code, Art. 3285; and a renewal or the revival of an extinct primary obligation does not ipso facto revive or bring back to life the accessory obligation. Dawson v. Thorpe, 39 La.Ann. 366, 1 So. 686; Spencer v. Goodman & Bradfield et al., 33 La.Ann. 899; Theriot v. Dugas' Heirs, 2 La.App. 109.

■ There is no doubt whatever that Gross and Franklin, soon after the accident wherein the Hollands were injured, discussed the possible effect litigation growing out of it would have upon the financial condition of the former. Gross admits that such, in a manner, was done. He admits also that the knowledge that attorneys were investigating the public records to ascertain the status of property owned by him quickened his desire and purpose to protect Franklin, and that such knowledge prompted the execution of the dation en paiement. It is clear, therefore, that this instrument was executed to protect Franklin and to give him an unfair preference over other creditors of Gross, especially plaintiffs, in these consolidated cases.

As having peculiar reference to the contract of "giving in payment", Art. 2658 of the Civil Code, in part, provides: "He [the debtor] may, although insolvent, lawfully sell for the price which is paid to him; but the law forbids to give in payment to one creditor, to the prejudice of the others, any other thing than the sum of money due."

The reason of this rule is obvious. The property of the debtor is the common pledge of all his creditors. The law forbids that he, when insolvent, should discriminate between his creditors, and inhibits him from giving to one or more of them an unfair preference over others by transferring to him or them assets to the prejudice of the others. The question here presented was rather thoroughly discussed by this court in Southland Investment Company v. Michel, 149 So. 177, 179, wherein we said: "The questions of good faith, knowledge of insolvency of the debtor, and innocent motives on the part of the grantee in a dation en paiement from an insolvent debtor are not material to a correct determination of the legal status of such a transaction. Under the plain language of article 2658 of the Civil Code, quoted above, the insolvent debtor is inhibited to give his property to a creditor 'to the prejudice of the others' (creditors). The natural sequel to the giving in payment by an insolvent to one creditor to discharge an unsecured obligation is injury and prejudice to the other unsecured creditors. Such act of necessity gives an unfair preference to the creditor thus favored, and, in the eyes of the law, amounts to legal and constructive fraud. The property of a debtor being the common pledge of all his creditors, it would be highly unjust and inequitable for one to be permitted to receive in payment any part of the assets of the common debtor in preference to other creditors. And, in this connection, the law does not require that fraudulent motives on part of the debtor, as a fact, shall be proved in order to strike with nullity a giving in payment by him. The act itself, which works prejudice and injury to other creditors, in legal contemplation superinduces constructive or legal fraud as a motivating cause of the transaction."

Many authorities, recent and ancient, of this state are cited to support what was held in that case. The quoted portion of the opinion aptly fits the present case.

The testimony is likewise convincing that at the time of the dation en paiement Gross' assets were not of sufficient value to discharge his liabilities, if we concede the moral obligation due to Frank-lin a liability, and excluding the potential liability to plaintiffs in these six suits.

If this potential liability is to be considered in determining whether Gross was solvent or not when the dation en paiement was signed, of course, his liabilities will more than double the value of his assets. If we eliminate the property conveyed to Franklin and the indebtedness for which it was conveyed, this will still leave Gross insolvent. His remaining assets are mortgaged or pledged according to his own calculation, for more than their value. It is certain that if the dation en paiement should be upheld, plaintiffs could recover nothing from Gross' remaining property.

"Insolvent circumstances", according to Art. 1985 of the Civil Code, exist when "The whole property and credits are not equal in amount, at a fair appraisement, to the debts due by the party."

When a plaintiff, who alleges the insolvency of his debtor, shows the amount of his debts, it is then encumbent on the debtor to show property to an equal or greater value if he would prove his solvency.

Defendants herein have not met and discharged this test. We conclude that Gross, at the time he made the dation en paiement to Franklin, was insolvent, within the purview and meaning of the Articles of the Civil Code dealing with that question.

For the reasons herein assigned, the judgments of the lower court in the tort action and on the exception of no cause and no right of action are affirmed; and, for said reasons, the judgment rejecting plaintiff's demand in the revocatory action is hereby annulled, avoided and reversed; there is now judgment in favor of plaintiff and against defendants decreeing the dation en paiement, attacked herein, to be a fraudulent transaction, confected for the purpose of giving to defendant Franklin an unfair preference over other creditors of defendant Gross; and, for these reasons, said dation en paiement is annulled and set aside and the property therein described is hereby decreed to belong to said Gross, subject to the payment of the money judgment herein, by preference and priority as fixed by law.

It is further decreed that all costs in the tort action be and they are hereby assessed against defendant Gross, and all costs incurred in the revocatory action are assessed jointly against both defendants.